E-FILED
Tuesday, 12 May, 2020  05:39:28 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | | |
|---|---|---|---|
| JESUS HOUSE RESTORATION MINISTRIES, an Illinois Not-For-Profit Corporation, and DUSTIN BROWN, an individual, | ) ) ) ) | | |
| Plaintiffs, | ) ) | | |
| v. | ) ) | No. | 3:20-cv-3123 |
| JAY ROBERT PRITZKER, Governor of the State of Illinois, in his official capacity, | ) ) ) ) | | |
| Defendant. | ) | | |

## COMPLAINT

Plaintiffs, Jesus House Restoration Ministries and Pastor Dustin Brown, by and through their counsel, the Thomas More Society, complain of Defendant Jay Robert Pritzker, as follows:

## INTRODUCTION

1.      Fear of the coronavirus epidemic has gripped Illinois, the nation, and the world. In response to the initial surge in coronavirus cases, numerous states imposed "stay-at-home" orders, in order to "flatten the curve" of the spread of the virus. Due to the unified efforts of the American people, the curve has flattened nationally, and in Illinois.

2.      In many states, these stay-at-home orders protected the constitutional rights of churches and religious believers during the coronavirus epidemic. Not so in the Land of Lincoln.

3.      Here, you can enter an "essential" dispensary to obtain recreational marijuana, but you cannot attend an outdoor worship ceremony, even when social distancing is employed.

4.      Defendant Pritzker in his orders originally declared churches and church ministries "non-essential" and commanded them to shut down. Pritzker forbade congregants from leaving their homes to attend church or church ministries. On the eve of Easter, the holiest

day on the Christian calendar, Pritzker expressly prohibited even no-contact, drive-in services in Illinois church parking lots. At the same time, he declared a laundry list of businesses to be "essential," from liquor stores to lawyers to landscapers.[1]

5.      Pritzker forbade congregants from leaving their homes to attend church or church ministries. On the eve of Easter, the holiest day on the Christian calendar, Pritzker expressly prohibited even no-contact, drive-in services in Illinois church parking lots. At the same time, he declared a laundry list of businesses to be "essential," from liquor stores to lawyers to landscapers.

6.      Coincidentally, the day after Pritzker's church ban was challenged in federal court in *Casell v. Snyders*, No. 20-cv-50153, Pritzker issued a new executive order classifying "the free exercise of religion" as an essential activity and authorizing drive-in church services for the first time. The new order also authorized in-person church services for the first time, but only if they involve no more than 10 people. The new order makes "the free exercise of religion" the only exempted business or activity expressly subject to the 10-person limit.

7.      Pritzker's statements and actions during the coronavirus epidemic demonstrate an illegal and discriminatory hostility to religious practice, churches, and people of faith. He has flagrantly violated the fundamental religious liberties of Illinoisans, in violation of the First Amendment.

8.      In recent days, a number of law enforcement officials (*e.g.*, Douglas County Sheriff Joshua Blackwell, Energy Police Chief Shawn Ladd, Woodford County State's Attorney

---

[1] Defendant Pritzker's stay-at-home orders divide businesses into "essential" and "non-essential," with essential businesses allowed to operate with minimal alterations while non-essential businesses are closed to the public.

Greg Minger, Tazewell County Sheriff Jeff Lower) have publicly announced they will refuse to enforce Pritzker's orders, some going so far as to state they are unconstitutional, such that enforcement would be a violation of their oath of office.

9.     At least one of these law enforcers cited as support a widely circulated and reported memo recently sent by the Chief Deputy Director of the Illinois Appellate Prosecutor's Office to the Director, for use in that Office's role as advisor to Illinois State's Attorneys, casting substantial doubt on the constitutionality of numerous provisions of Pritzker's executive orders. The Chief Deputy Director's memo specifically references the restrictions on religious activity therein, noting that "the EO is very broad and does not appear to meet strict scrutiny -- this is not to mention the EO appears to be beyond the framework of the specific Act it cites as support." *See*, https://www.policeone.com/coronavirus-covid-19/articles/ill-chief-police-hold-no-interest-in-enforcing-stay-at-home-order-DNteArzdzYDmvGh2/ (citing Memo found at https://edgarcountywatchdogs.com/wp-content/uploads/2020/04/COVID-19-Memo-4.21.20-003.pdf).

10.     Despite the deep statewide concerns about the shaky legal foundations of his orders, Pritzker has not yielded to those concerns, but instead doubled down, announcing he will extend his orders to the end of May and beyond. Throughout, the Illinois State Police has threatened criminal enforcement of the orders statewide, even when local law enforcement decides not to do so. *See, e.g.,* https://newschannel20.com/news/local/isp-clarifies-enforcement-of-stay-at-home-order ("'While the goal is voluntary compliance, citizens should be aware that non-compliance with the Executive Order can result in criminal and civil sanctions,' said an Illinois State Police spokesperson.") & https://www.wglt.org/post/pekin-country-club-golf-course-closes-after-state-police-intervene#stream/0 ("Illinois State Police delivered a cease-and-

desist letter to the private venue to force compliance with Gov. J.B. Pritzker's stay-at-home executive order. . . . Tazewell County Sheriff's Office had expressed 'no issue' with continued golfing at the Pekin Country Club").

11.     It has also been publicly reported that prominent government officials have violated Pritzker's orders, without consequence. Chicago Mayor Lori Lightfoot famously violated the orders and got a haircut, despite the hair stylists and barbers of the state being shut down, with no income and still being unable to access unemployment benefits nearly 6 weeks into the mandatory shutdown.

12.     Plaintiffs, a not-for-profit ministry and its church's pastor, believe that in these dark times, Illinoisans need Almighty God at least as much as the spirits dispensed at the state's liquor stores. The churches and pastors of Illinois are no less "essential" than its liquor stores or marijuana dispensaries to the health and well-being of its residents. Defendant has thus intentionally denigrated Illinois churches and pastors and people of faith by relegating them to second-class citizenship. Defendant has no compelling justification for his discriminatory treatment of churches and pastors and people of faith, nor has he attempted in any way to tailor his regulations to the least restrictive means necessary to meet any arguable compelling interest.

13.     Plaintiffs intend to hold public worship services—outside and employing as much social distancing as possible—every Sunday until it is safe to resume indoor, normal services. They justifiably fear arrest and prosecution if they do so, without immediate relief from this Court.

14.     Plaintiffs seek temporary and permanent injunctive relief against Pritzker's orders barring their outdoor services as illegal and unconstitutional on their face and as applied to Plaintiffs.

## PARTIES

15.     Jesus House Restoration Ministries ("Jesus House") is an Illinois not-for-profit corporation with 501(c)(3) status.

16.     Dustin Brown is a resident of the State of Illinois.

17.     Defendant Jay Robert Pritzker is the governor of the state of Illinois, and his sued in his official capacity.

## VENUE

18.     Plaintiffs are residents in the Central District. Many of the acts and omissions, and the effects of the acts and omissions, giving rise to this case occurred in the Central District. Venue is thus proper in this District under 28 U.S.C. 1391.

## JURISDICTION

19.     This court has jurisdiction over the claims asserted here under the federal question provision of the Judicial Code, 28 U.S.C. § 1331 and under 42 U.S.C. § 1983.

20.     As alleged more fully below, all of Defendant's actions that have deprived Plaintiffs of rights under the U.S. Constitution have been taken under color of law.

21.     This Court has the authority to grant the requested injunctive relief under 28 U.S.C. § 1343(3) and declaratory relief under 28 U.S.C. §§ 2201 and 2202, and to grant costs, including reasonable attorney's fees, under 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

## FACTS

### Plaintiffs and Their Sincerely Held Religious Beliefs

22.     Jesus House is based in Urbana, Illinois and focuses on long-term addiction recovery from a Christian, non-denominational perspective. The ministry offers residential

discipleship training for men and women who have a desire to follow Jesus Christ. Both Illinois courts and the Illinois Department of Corrections refer individuals to Jesus House.

23.     One component of Jesus House's ministry is its church, The Table. Plaintiff Dustin Brown is a pastor at The Table. Dustin Brown was ordained as a minister by Christ Theological Seminary in Urbana, Illinois.

24.     Plaintiffs are passionate to share the love of God with their congregants, who form what they believe is their Church family. Plaintiffs believe that through connecting with those in need, they can assist them in building a Godly and rock-solid foundation that cannot be shaken under any circumstance. To that end, Plaintiffs offer their understanding and personal experience with the issues and problems facing today's world, including the coronavirus epidemic. Pastor Brown lives, works, and ministers among and alongside his Church family. Plaintiffs are dedicated to being available to congregants and community members for counsel and assistance in any area of their lives. Plaintiffs believe there is no problem or situation too big or small for their gracious Savior to overcome.

25.     Plaintiffs hold sincerely-held religious beliefs rooted in Scripture that Christians are called to gather together in worship of the Triune God, which is the very purpose of "church"—as translated from the word "ekklesia" in Greek, which means "assembly."

26.     Plaintiffs also sincerely believe that religious gatherings have a fundamental right to be treated at least as well under the law as other activities that Defendant Pritzker allows, even though those permitted activities may pose some risks regarding the spread of COVID-19. Plaintiffs sincerely believe that they must continue to minister to their congregation on Sundays and that they have restricted their practices in response to COVID-19 as much as possible.

27.     The Table holds worship services on Sundays. 70 to 75 people usually show up. Roughly 30-40% of attendees are homeless or without a permanent home address, and many of those in the congregation suffer from addiction and mental health problems. Most attendees do not have access to automobiles and get to worship services by bus or by walking, making attending service within an automobile, as some churches have attempted, impossible.

28.     Sunday services include the proclamation of portions of scripture by Pastor Brown to the assembled congregation; a message preached on the chosen scriptural passage by Pastor Brown to the assembled congregation; oral, communal proclamation of prayers by both Pastor Brown and the assembled congregation; and communal singing of praise and worship by Pastor Brown and the assembled congregation.

29.     Studies suggest that most Covid-19 transmission happens indoors, not outdoors. In China, a study of 318 outbreaks found that transmission occurred outdoors in only one of them. *Indoor transmission of SARS-CoV-2*, https://www.medrxiv.org/content/10.1101/2020.04.04.20053058v1 (last visited May 11, 2020). In Japan, a study found that "the odds that a primary case transmitted Covid-19 in a closed environment was 18.7 times greater compared to an open-air environment." *Closed environments facilitate secondary transmission of coronavirus disease 2019 (COVID-19),* https://www.medrxiv.org/content/10.1101/2020.02.28.20029272v2 (last visited May 11, 2020).

30.     In recent weeks, given the COVID-19 pandemic, Pastor Brown and The Table have held services outdoors with social distancing precautions in place. The Table sets folding chairs out at least six feet apart, although family members can congregate together without such distancing. Because of the nature of the ministry, there are normally no more than five or six minors in attendance. Photos of a recent services are attached as **Exhibits 1** and **2**.

31.     Twice during the pandemic, Plaintiffs held services in a public park in Champaign, Illinois, but were told by public health officials that this was impermissible and that they should hold services on private property. Since then, Plaintiffs have held services on a private parking lot in Champaign. Plaintiffs have held these services despite being the subject of a cease and desist order (**Exhibit 3**) based on the Governor's COVID-19 restrictions on gatherings, discussed below. That cease and desist order, dated April 20, 2020, has been superseded by subsequent executive orders from Pritzker. Plaintiffs intend to keep holding these services, but they are fearful of prosecution for themselves and their congregation.

32.     As the formal worship service concludes, it dissolves into a second phase in which individual staff members at The Table offer to pray privately with any attendees who ask for private prayer. The staff member will go to these individuals or families separately and pray at their side. They sincerely believe that the Scripture requires them to "lay hands on" the person for whom they are individually praying. The Table's staff is willing to use personal protective equipment such as masks and gloves in these interactions if necessary but has not thus far.

33.     Following any private prayer that may occur, the next phase of the church gathering is service of hot meals. These are prepared off-site and are individually wrapped in cellophane.

34.     The fourth and final phase of the church gathering involves handing out clothing to those in need.

35.     The assembly of participants at these Sunday services, the communal prayer and singing, the communal preaching and fellowship, and the private prayer after the services are all essential parts of a functioning Christian congregation.

36. Handing out meals and clothing is also an essential part of Plaintiffs' religious mission.

37. The weekly Sunday worship and prayer services are the central religious rites of the Church congregation. *See, e.g.,* James 5:14 ("Is any sick among you? Let him call for the elders of the church; and let them pray over him, anointing him with oil in the name of the Lord . . . .") & Hebrews 10:24-25 ("And let us consider how we may spur one another on toward love and good deeds, not giving up meeting together, as some are in the habit of doing, but encouraging one another—and all the more as you see the Day approaching."). The congregation cannot truly "work from home," without forfeiting many of the great spiritual and religious benefits and comforts they receive from Plaintiffs. Few if any of this congregation's participants even have computers.

38. Plaintiffs' activities mirror the social service activities of a daytime drop-in center for the homeless located just across the street from the parking lot Plaintiffs use for their worship services. But only Plaintiffs' activities, and not the drop-in center for the homeless across the street, are subject to the 10-person maximum rule.

39. Pastor Brown's organization of Sunday services, his role as pastor and preacher, and his prayer and spiritual counseling are central functions of his leadership of the Church. Pastor Brown believes and teaches these functions are scripturally mandated for anyone claiming to hold the office of pastor of a Christian congregation. They are, therefore, religiously required for him to perform.

**Governor Pritzker's Orders**

40.     On March 9, 2020, Governor Pritzker issued a Gubernatorial Disaster Proclamation declaring a state of emergency in the State of Illinois as a result of the spread of COVID-19. *See* **Exhibit 4**.

41.     On March 13, 2020, Governor Pritzker issued Executive Order 2020-04 cancelling "all public and private gatherings in the State of Illinois of 1,000 people or more." *See* **Exhibit 5**.

42.     On March 16, 2020, Governor Pritzker issued Executive Order 2020-07 banning "all public and private gatherings in the State of Illinois of 50 or more people." *See* **Exhibit 6**. This Order expressly applied to "faith-based events [that] bring[] together 50 or more people in a single room or a single space at the same time," but expressly excluded "essential" services like grocery stores, gas stations, and shelters. This Order also directs the Illinois State Police, the Illinois Department of Public Health, the State Fire Marshal, and the Illinois Liquor Control Commission to cooperate with one another and use all available resources to enforce the Order's restrictions.

43.     On March 20, 2020, Governor Pritzker issued Executive Order 2020-10 purporting to require all individuals in the State of Illinois to "stay at home or at their place of residence." *See* **Exhibit 7**. Section 1(3) of this Order describes "Prohibited Activities" and states that "*[a]ll* public and private gatherings of *any number* of people . . . are prohibited," (emphasis added), before inconsistently stating that "any gathering of *more than ten* people is prohibited, unless exempted by this Executive Order." (Emphasis added.) The Order goes on to exempt "Essential Businesses and Operations" from the gathering size limitations. Instead, Essential Businesses and Operations "are encouraged to remain open" and "to the greatest extent feasible .

. . comply with Social Distancing Requirements as defined in" Section 1(15) of this Order, which does not impose a limit on gathering sizes. Essential Businesses and Operations include the broad categories of Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, Essential Infrastructure, and 23 broad categories of commercial or charitable businesses such as marijuana dispensaries, organizations that provide charitable and social services, retail stores, hardware stores, laundry services, and hotels.  This Order also ostensibly exempts "essential activities" from the gathering size limit since many of these activities include patronizing essential businesses, which, again, are not subject to the 10-person maximum on gatherings sizes.

44.     On April 1, 2020, Governor Pritzker issued Executive Order 2020-18 continuing the prohibitions of the previous executive orders through April 30, 2020. *See* **Exhibit 8**.

45.     On April 1, 2020, Governor Pritzker issued a second Disaster Proclamation extending his purported authority to issue emergency declarations as a result of COVID-19. *See* **Exhibit 9**.

46.     On April 30, 2020, Governor Pritzker issued yet another Disaster Proclamation extending the original disaster proclamation and his purported authority to issue COVID-19-related executive orders until May 30, 2020. *See* **Exhibit 10**.

47.     On April 30, 2020, Governor Pritzker also issued Executive Order 2020-32 replacing Executive Order 2020-10 and continuing to prohibit "any gathering of more than ten people, unless exempted by this Executive Order." *See* **Exhibit 11**. This Order continues to exempt the broad categories of Essential Businesses and Operations and essential activities from the prohibition on gatherings of more than 10. But this Order makes at least two key changes.

48.     First, in Section 1(2), it adds a new requirement for "essential stores"—meaning "Retail stores . . . designated as Essential Businesses and Operations"—to "cap occupancy at 50 percent of store capacity or, alternatively, at the occupancy limits based on store square footage set by the Department of Commerce and Economic Opportunity," thus confirming that such retail stores (and the essential activities of shopping therein) were not previously subject to any gathering size limitations, and remain exempt from the prohibition on gatherings of more than 10 people. This section also requires essential stores to set up one-way store aisles marked by conspicuous signage and to communicate with customers about social distancing requirements. All of this is to be done only "to the greatest extent possible."

49.     Second, in Section 2(5) describing "essential activities," this Order adds a new subsection (vi) titled "To engage in the free exercise of religion," as long as these activities "comply with Social Distancing Requirements *and the limits on gatherings of more than ten people*." Additionally, this exception states that "[r]eligious organizations and houses of worship are encouraged to use online or drive-in services to protect the health and safety of their congregants." This is the only exempted activity in the entire Order that is specifically subject to the prohibition on gatherings of more than 10 people.

50.     On April 30, 2020, Governor Pritzker also issued Executive Order 2020-33, which continues Executive Orders 2020-04 and 2020-07 through May 29, 2020. *See* **Exhibit 12**.

51.     On May 5, 2020, Governor Pritzker released a plan titled "Restore Illinois" purporting to describe stages for reopening religious services and gatherings in Illinois. *See* **Exhibit 13**.

52.     Phases 1, 2, and 3 of the "Restore Illinois" plan continue to purportedly limit in-person gatherings to 10 or fewer people, although Phase 3 is "subject to change based on the latest data and guidance."

53.     Only in Phase 4 are gatherings of up to 50 people allowed, which will occur when the "rate of infection among those surveillance tested and the number of patients admitted to the hospital continues to decline," but is "subject to change based on the latest data and guidance. *See* **Exhibit 13 at 4, 9**.

54.     Phase 5 will finally authorize gatherings of more than 50 people, but it will not occur until "a vaccine is developed," "a treatment is readily available," or "there are no new cases over a sustained period." *See* **Exhibit 13 at 10**.

55.     In a May 6, 2020, press conference, Governor Pritzker declared that churches might not be permitted to have gatherings of more than 50 people for more than 12 to 18 months, even if they comply with Social Distancing Requirements and regardless of the size of facilities. *See Gov. Pritzker's Coronavirus (COVID-19) Press Conference, Wednesday, May 6, 2020*, State of Illinois Coronavirus (COVID-19) Response, available at

https://coronavirus.illinois.gov/s/news-archive and https://vimeo.com/415693668 (last visited May 11, 2020).

56.     Plaintiffs hereinafter refer to all of the above proclamations, executive orders, and "Restore Illinois" plan as "Orders."

### Illinois Has "Flattened the Curve"

57.     The epidemic is in a much different place today than it was on March 9, 2020. At this point, it is widely reported that the coronavirus epidemic "curve" has been substantially "flattened" statewide. *See, e.g.*, https://wgntv.com/news/coronavirus/over-2000-new-cases-of-

covid-19-in-illinois-59-additional-deaths/ ("As infection rates seem to suggest a 'flattening' of the coronavirus curve in Illinois, officials are scaling back the number of beds available at McCormick Place. Only 1,000 of the original 3,000 hospital beds at the alternate care facility will remain operational."). With the temporary hospital at McCormick Place now being significantly scaled back, hospital and ICU capacity have clearly proven sufficient to meet the coronavirus challenge. *See, e.g.*, http://www.dph.illinois.gov/covid19/hospitalization-utilization (last visited May 11, 2020).

58.    The principal reason for Governor Pritzker's Orders was to "flatten the curve" to preserve hospital capacity, and that aim has now been achieved. *See, e.g.*, https://www.nbcchicago.com/news/local/pritzker-says-illinois-needs-38000-more-beds-for-covid-19/2243800/?_osource=SocialFlowTwt_CHBrand (last visited May 11, 2020). Yet Governor Pritzker's Orders continue to single out churches and religious activities for disparate treatment among all exempted businesses and activities even now that the level of coronavirus infections is stable. *See, e.g.*, rt.live (showing that the Illinois Rate of transmission, "Rt," is at .91, where "Values over 1.0 mean we should expect more cases in that area, values under 1.0 mean we should expect fewer") (last visited May 11, 2020).

59.    Now that the "curve" has been "flattened," the time has come to restore equal treatment to churches.

### Constitutional Rights in the Time of a Pandemic

60.    Plaintiffs know these are not normal times. As the Supreme Court has long held, government may restrain individual liberties "by reasonable regulations, as the safety of the general public may demand." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 29

(1905). And "[t]he right to practice religion freely does not include the liberty to expose the community . . . to communicable disease." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).

61.     However, "individual rights secured by the Constitution do not disappear during a public health crisis." *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020). Under the *Jacobson* standard, governments may not restrict liberties in "an arbitrary, unreasonable manner," or in a way that "go[es] so far beyond what was reasonably required for the safety of the public." *Jacobson*, 197 U.S. at 28.

62.     Thus, when evaluating challenges to laws "purporting to have been enacted to protect . . . public health," courts must ask whether the law "has no real or substantial relation to those objects, *or* is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* (emphasis added).

63.     Defendant Pritzker's Order fails this test. Restricting churches to no more than 10 people, while allowing gatherings of more than 10 for all manner of other businesses and activities, is arbitrary and unreasonable under *Jacobson*, even in these difficult times. Singling out churches as the only authorized activity expressly subject to the 10-person rule is not substantially related to the goal of preventing COVID-19, and is, "beyond all question, a plain, palpable invasion" of Plaintiffs' First and Fourteenth Amendment rights.

64.     Under the Supreme Court's seminal free exercise cases of *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990) and *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993), neutral laws of general applicability are presumptively valid under the Free Exercise Clause. But laws that are *not* neutral *or not* generally applicable are a different story—indeed, they are presumptively *invalid* under the Free Exercise Clause and can survive only if they satisfy strict scrutiny. *Lukumi*, 508 U.S. at 532.

65.     Additionally, even neutral and generally applicable laws that burden free exercise rights "in conjunction with other constitutional protections, such as the freedom of speech," give rise to a "hybrid rights" claim and also must undergo strict scrutiny. *Smith*, 494 U.S. at 881.

66.     Governor Pritzker's Orders trigger strict scrutiny at each of these steps. They are not neutral because among all exempted activities in EO 2020-32—including "businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged individuals"; shopping for groceries, pet food, hardware, clothes, shoes, or even marijuana; or engaging in law firm office meetings or working at a manufacturer or operating retail outlets or a Menards, Walmart, or all manner of other businesses—"free exercise of religion" is the only exempted activity specifically singled out as subject to the 10-person maximum rule. *See Lukumi*, 508 U.S. at 534 ("Official action that targets religious conduct for distinctive treatment" fails the test of neutrality).

67.     Plaintiffs' activities mirror the social service activities of a daytime drop-in center for the homeless across the street from the parking lot Plaintiffs use for their worship services, but for the fact that Plaintiffs' activities also involve religious worship. The daytime drop-in center for the homeless is not subject to the 10-person rule, and this is strong indication that the "object" of the Orders prohibiting Plaintiffs' activities "is to infringe upon or restrict [Plaintiffs'] practices because of their religious motivation." *Id*.

68.     Governor Pritzker's Orders are also not generally applicable because all of the above secular functions exempted from the 10-person rule endanger the government's interest to the same or greater degree as Plaintiffs' religious services, which are conducted in compliance with Social Distance Requirements "to the greatest extent possible."

69.     The Orders are thus substantially underinclusive—that is, they "fail to prohibit nonreligious conduct that endangers [the government's interests] in a similar or greater degree than [the prohibited religious activity] does." *Id*. at 543. This type of law "fall[s] well below the minimum standard necessary to protect First Amendment rights." *Id*.

70.     As the Sixth Circuit observed last weekend, "[W]hy can someone safely walk down a grocery store aisle and not a pew? And why can someone safely interact with a brave deliverywoman but not a stoic minister?" *Theodore Joseph Roberts v. Robert Neace*, No. 20-5465, Slip Op. at *8 (6th Cir. May 9, 2020) (granting motion for injunction pending appeal against Kentucky Order restricting any in-person worship gatherings no matter the number of people in attendance).

71.     Although the Kentucky Order prohibited *all* in-person religious services no matter the number of people, it met its temporary doom under the same logic deployed in another recent decision by the United States District Court for the District of Kansas in *First Baptist v. Kelly*, 2020 WL 1910021 (D. Kan. April 18, 2020), which temporarily enjoined a prohibition on religious gatherings of more than 10 people.

72.     There, the court observed that "churches and other religious activities appear to have been singled out among essential functions for stricter treatment." *First Baptist*, 2020 WL 1910021 at *7. And it found that the same health and safety concerns that might be present in a church service would be just as present in the voluminous number of activities and businesses exempted from the 10-person rule, including airports, food pantries and shelters, detoxification centers, retail establishments, office spaces, and manufacturing facilities. *Id*.

73.     The same logic applies here, given the nearly identical factual similarities, rendering the Orders non-generally applicable and subject to strict scrutiny.

74.     Even if the Orders are neutral and generally applicable, they are still subject to strict scrutiny because they burden Plaintiffs' free exercise rights "in conjunction with" Plaintiffs' other constitutional rights, including the freedom of speech and assembly.

75.     Indeed, freedom of speech and assembly are "cognate rights" and, "though not identical, [they] are inseparable." *Thomas v. Collins*, 323 U.S. 516, 530 (1945). Here the Orders are a content- and viewpoint-based restriction on Plaintiffs' rights to free speech and assembly because they single out "engag[ing] in the free exercise of religion" as the lone exempted activity expressly subject to the 10-person maximum, which is manifestly based on the content and viewpoint of such expressive gatherings.

76.     And even if content-neutral, the Orders are not narrowly tailored speech restrictions in furtherance of a significant government interest because they burden substantially more expression than necessary to accomplish the government's interests—particularly where Plaintiffs, like the numerous other businesses and activities exempt from the 10 person rule, are committed to abiding by Social Distancing Requirements. *See McCullen v. Coakley*, 573 U.S. 464, 490 (2014) (holding that state-authorized buffer zones outside abortion facilities were an unreasonable regulation of speech because they burdened substantially more expression than necessary to achieve the government's asserted interests).

77.     Here, the Orders at least incidentally burden Plaintiffs' rights to free exercise of religion and free speech and assembly. Live streaming and drive-in services are not an option for Plaintiffs because most of those who worship in their church are homeless or impoverished and thus without means to access those kinds of services.

78.     Additionally, Plaintiffs have a sincerely held religious belief that followers of Jesus Christ are called to gather in worship by assembling themselves together in person. Indeed,

the entire purpose of church (which in Greek is translated "ekklesia," literally meaning "assembly") is to assemble together Christians to worship God.

79. Thus, the Orders are subject to strict scrutiny as a violation of Plaintiffs' hybrid rights under the First Amendment. And even if they're subject to lesser scrutiny, they burden substantially more expression than necessary and thus are still unreasonable restrictions of Plaintiffs' First Amendment rights.

80. Notably, the Orders plainly cannot survive strict scrutiny. "It is established in [the Supreme Court's] strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (internal quotation marks omitted).

81. Here the voluminous number of businesses and activities exempt from the 10-person rule endanger the government's interests in stopping COVID-19 to the same or greater degree as Plaintiffs' religious services.

82. Indeed, the only difference between Plaintiffs services and the daytime drop-in center for the homeless across the street is that Plaintiffs add the element of religious worship to their services. "The Free Exercise Clause protect[s] religious observers against unequal treatment," *id*. at 542 (internal quotation marks omitted) (alteration in original), and the Orders are a quintessential example of treating religious observers unequally.

83. As such, they run far afield from the requirements of the United States Constitution and Plaintiffs' rights thereunder to hold religious services that, like numerous other exempted businesses and activities during this time of COVID-19, are compliant with Social Distancing Requirements "to the greatest extent possible."

### The Orders Cause Plaintiffs Irreparable Harm

84.     Plaintiffs' injuries as a result of the Orders' discrimination against religion are ongoing and irreparable.

85.     Under the Orders, Plaintiffs have been singled out among all exempted businesses and activities for subjugation to the 10-person maximum, when numerous commercial and non-religious entities may accommodate gatherings of more than 10 people.

86.     Under the Orders, Plaintiffs have suffered and are suffering irreparable injury because their pastors, members, and attendees all remain under threat of criminal and civil sanction for worshiping with each other in gatherings of more than 10 while maintaining Social Distancing Requirements "to the greatest extent possible."

87.     As a result of the Cease and Desist Notice that Plaintiffs received on April 20, 2020 (**Exhibit 3**), Plaintiffs have been forced to choose between self-censoring their sincere religious beliefs and avoiding the threat of criminal sanctions, or following their sincerely held religious beliefs and remaining under threat of criminal sanctions. This ongoing double bind has caused, continues to cause, and will cause Plaintiffs irreparable injury.

88.     Defendant Pritzker has repeatedly confirmed that criminal enforcement and penalties attach to violations of his orders. *See, e.g.,* https://newschannel20.com/news/local/pritzker-police-can-charge-violators-of-stay-at-home-order ("If they refuse and if they repeatedly refuse, there is the ability by the police officers to charge them with reckless conduct and take them into custody.").

## COUNT I

### Violation of Plaintiffs' Rights to Free Exercise of Religion
### Under the First and Fourteenth Amendments

89.     Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1-88.

90.     The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, prohibits government from violating Plaintiffs' rights to freely exercise their sincerely held religious beliefs, including their freedom to worship.

91.     Plaintiffs have sincerely held religious beliefs rooted in Scripture that Christians are called to gather together in worship of the Triune God, which is the very purpose of "church"—as translated from the word "ekklesia" in Greek, which means "assembly."

92.     The Orders, facially and as applied, substantially burden Plaintiffs' religious beliefs because alternative methods of worship, such as livestreaming or drive-in services, are not available given that many of Plaintiffs' parishioners are homeless without access to the internet or vehicles. They also substantially burden Plaintiffs' sincere beliefs that religious gatherings have a right to at least equal treatment with substantially similar secular activities with respect to the government's interests in protecting people from COVID-19.

93.     The Supreme Court has declared that "a law burdening religious practice that is not neutral *or* not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993) (emphasis added).

94.     A law is not generally applicable when it is substantially underinclusive—that is, when it "fail[s] to prohibit nonreligious conduct that endangers [the government's interests] in a similar or greater degree than [the prohibited religious activity] does." *Id*. at 543. A law is not

neutral if its "object . . . is to infringe upon or restrict practices because of their religious

motivation." *Id*. at 533.

95.    The Orders, both on their face and as applied, are neither neutral nor generally

applicable with respect to religious gatherings.

96.    The Orders are not generally applicable because they exempt at least 23

categories of businesses from the prohibition on gatherings of more than 10 people. *See* **Exhibit

11**. These businesses include grocery stores, liquor stores, marijuana dispensaries, hardware

stores, gas stations, professional services like law firms, labor unions, hotels, warehouses,

supercenters, and other "big box" stores as long as they abide by Social Distancing Requirements

"to the greatest extent feasible" and "where possible," with no prohibition on gathering sizes of

more than 10. (*Id*.) The Orders also exempt from the gathering size limit numerous types of

"essential activities," many of which include patronizing essential businesses. (*Id.* at Sec. 2(5).)

These businesses and activities endanger the government's interest in stopping COVID-19 to a

similar or greater degree as religious gatherings that adhere to the same Social Distancing

Requirements.

97.    The Orders are not neutral because they specifically target religious gatherings for

discriminatory treatment. Indeed, "to engage in the free exercise of religion" is the only

"essential activity" specifically prohibited from having gatherings of more than 10 people (*id*. at

Sec. 2(5)(vi).), and essential businesses are entirely free of such a requirement. (*Id*. at Sec. 2(2).)

And under the Restore Illinois Plan, religious gatherings cannot have up to 50 people until Phase

4, and they cannot have more than 50 people until Phase 5 when "a vaccine is developed," "a

treatment option is readily available," "or there are no new cases over a sustained period." *See*

**Exhibit 13**. Meanwhile, all manner of other businesses and activities are allowed to have even

more than 50 people as we speak, thus effecting a "religious gerrymander" that singles out religious activity for disparate treatment. *Lukumi*, 508 U.S. at 534.

98.     Even if the Orders are neutral and generally applicable, which they're not, the Orders, facially and as applied, burden Plaintiffs' right to free exercise of religion "in conjunction with other constitutional protections, such as freedom of speech." *Smith*, 494 U.S. at 881. The Orders thus present "a free exercise claim []connected with [] communicative activity," *id*. at 882, and thus must survive the same scrutiny as laws that are not neutral and generally applicable.

99.     Laws that are not neutral or generally applicable "must undergo the most rigorous of scrutiny"—that is, they must be narrowly tailored in furtherance of "interests of the highest order." *Lukumi*, 508 U.S. at 546. And "a law cannot be regarded as protecting an interest 'of the highest order' . . .  when it leaves appreciable damage to that supposedly vital interest unprohibited." *Id*. at 547.

100.     The Defendant cannot meet his burden of demonstrating a compelling, legitimate, or rationale interest in the Orders' application of different standards for churches and religious gatherings than those applicable to exempted businesses activities. The Orders exempt numerous secular activities that undermine the government's interests to the same or greater degree than Socially Distant religious gatherings and thus leave appreciable damage to those purported interests unprohibited.

101.     Nor can the Defendant meet his burden of showing that the Orders, on their face and as applied, are also the least restrictive means to accomplish the government's purported interest where religious gatherings adhere to the same Social Distancing Requirements followed by exempted businesses and activities.

102.     The Orders, on their face and as applied, are "riddled" with exemptions that effectively set up a system of individualized exemptions that permits similarly situated businesses and activities to continue operations within certain limits while prohibiting religious gatherings, such as Plaintiffs' church and worship service, from operating within similar limits.

103.     The Orders, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm.

104.     Plaintiffs have no adequate remedy at law to correct this deprivation of their fundamental rights to the free exercise of religion.

## COUNT II

### Violation of Plaintiffs' Right to Peaceable Assembly
### Under the First and Fourteenth Amendments

105.     Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1-104.

106.     The First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, prohibits government from violating Plaintiffs' right to peaceably assemble.

107.     The Orders, on their face and as applied, infringe Plaintiffs' right to peaceably assemble. The orders forbid Plaintiffs from assembling on the basis of the viewpoint and content of their message, because no other essential business or activity is prohibited from having gathering sizes of more than 10 people other than the "free exercise of religion." (*See* **Exhibit 11** at Sec. 2(5)(vi).) In other words, among exempted activities, only assembly for the free exercise of religion is specifically required to maintain gathering sizes of 10 and under.

108.     Indeed, the only difference between Plaintiffs and the homeless daytime drop-in center across the street is the religious content, viewpoint, and purpose of Plaintiffs' assembly.

Yet the drop-in center is allowed to continue operating unabated with more than 10 people, while Plaintiffs are forbidden from assembling with more than 10 people

109.    Even if they were content and viewpoint neutral, which they're not, the Orders, on their face and as applied, cannot be shown by Defendant to be narrowly tailored to serve a compelling governmental interest.

110.    The Orders, on their face and as applied, burden substantially more expression than necessary given that all manner of other businesses and activities are allowed (formally or effectively) to have gatherings of more than 10 people as long as they adhere to Social Distancing Requirements to the "extent feasible," while Plaintiffs are not allowed to engage in religious expression with more than 10 people despite their commitment to complying with the same Social Distancing Requirements.

111.    The Orders, on their face and as applied, also do not leave open ample alternative channels of expression because most of Plaintiffs' worshippers are homeless or are otherwise without means to access the internet and participate in online worship services, or to access vehicles to participate in drive-in religious services.

112.    The Orders, on their face and as applied, are irrational and unreasonable and unduly burden Plaintiffs' fundamental right to have in-person religious assemblies of more than 10 people as long as they comply with Social Distancing Requirements.

113.    The Orders, on their face and as applied, unconstitutionally grant enforcing government officials, including Governor Pritzker and his designees, unbridled discretion to apply or not apply the Orders in a manner that prohibits Plaintiffs' right to freely and peaceably assemble.

114.     The Orders, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs to suffer immediate and irreparable injury and undue hardship by forbidding them from sufficiently exercising their right to peaceably assemble.

115.     Plaintiffs have no other adequate remedy at law to correct this ongoing deprivation of their First Amendment right to peaceably assemble.

## COUNT III

### Violation of Plaintiffs' Right to Freedom of Speech Under the First and Fourteenth Amendments

116.     Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1-115.

117.     The Free Speech Clause of the First Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment, prohibits the government from violating Plaintiffs' freedom of speech.

118.     The Orders, on their face and as applied, violate Plaintiffs' freedom of speech. The Orders restrict Plaintiffs from expressing their religious message to a gathering of more than 10 people based on content and viewpoint, as no other exempted activity, other than activities for "the free exercise of religion," are explicitly subject to the prohibition on gatherings of more than 10.

119.     Indeed, the only difference between Plaintiffs and the homeless daytime drop-in center across the street is the religious content, viewpoint, and purpose of Plaintiffs' assembly. Yet the daytime drop-in center is allowed to continue operating unabated with more than 10 people, while Plaintiffs are forbidden from assembling with more than 10 people.

120.    Even if they were content and viewpoint neutral, which they're not, the Orders, both on their face and as applied, are not narrowly tailored to serve the government's asserted interests.

121.    The Orders, on their face and as applied, burden substantially more speech than necessary because they completely forbid Plaintiffs from expressing their message to a gathering of more than 10 people even if they abide by Social Distancing Requirements, while numerous other businesses and activities are allowed to have gatherings of more than 10 people if they abide by Social Distancing Requirements.

122.    The Orders, on their face and as applied, also fail to leave open ample alternative channels of communication, because many of Plaintiffs' listeners are homeless or otherwise without means to access worship services online, or to access vehicles for the purpose of attending drive-in services.

123.    The Defendant cannot meet his burden of demonstrating that the Orders, on their face and as applied, advance any compelling, legitimate, or rational interests of the government as applied to Plaintiffs' Socially Distant religious services.

124.    The Defendant cannot meet his burden of demonstrating that the Orders, on their face and as applied, are the least restrictive means of accomplishing the government's asserted interests, since Plaintiffs comply with the same Social Distancing Requirements as other businesses and activities that are not subject to the 10-person limit.

125.    The Orders, on their face and as applied, are irrational and unreasonable and unduly burden Plaintiffs' First Amendment right to freedom of speech.

126.     The Orders, on their face and as applied, unconstitutionally grant the government unbridled discretion to apply or not apply the Orders against Plaintiffs in violation of their freedom of speech.

127.     The Orders, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable injury and undue hardship as a violation of their First Amendment right to freedom of speech.

128.     Plaintiffs have no other adequate remedy at law to correct this continuing violation of their free speech rights.

### COUNT IV

**Violation of Plaintiffs' Right to Equal Protection Under the Fourteenth Amendment**

129.     Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1-128.

130.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution protects Plaintiffs' right to equal protection under the law.

131.     The Orders, on their face and as applied, violate Plaintiffs' right to equal protection by imposing unequal treatment on them because of, not in spite of, the religious nature of their gatherings and the religious content and viewpoint of their expression.

132.     The Orders, on their face and as applied, unconstitutionally subject Plaintiffs to disparate treatment in comparison to other non-religious and similar activities that endanger the government's interests as much or more than Plaintiffs' socially distant religious services.

133.     The Orders, on their face and as applied, discriminate against Plaintiffs based on their exercise of a fundamental right and thus are subject to strict scrutiny.

134.     The Orders, on their face and as applied, fail to advance a compelling, legitimate, or rational interest of the government as applied to Plaintiffs' socially distant religious gatherings.

135.     The Defendant cannot meet his burden of demonstrating that the Orders, on their face and as applied, are the least restrictive means of advancing the a compelling interest of the government, particularly given that other similarly situated businesses and activities are not subject to the 10-person maximum if they adhere to Social Distancing Requirements, and given that Plaintiffs, too, adhere to Social Distancing Requirements.

136.     The Orders, on their face and as applied, are irrational and unreasonable and unduly burden Plaintiffs' right to equal protection of the law.

137.     Plaintiffs have no adequate remedy at law to correct the continuing violation of their right to equal protection.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor against Defendant and ask that the Court grant:

A.  A declaratory judgment in favor of Plaintiffs and against Defendant and those under his power, declaring that the Orders of the Defendant are unconstitutional under the First and Fourteenth Amendments, on their face and as applied, to the extent they forbid the outdoor, socially-distanced, communal religious activities and the pastoral activities and food and clothing distribution of Plaintiffs as set forth herein;

B.  A temporary restraining order, preliminary injunction and permanent injunction restraining Defendant and those under his power from preventing or interfering with their outdoor, socially-distanced, communal religious activities and the

pastoral activities and food and clothing distribution of Plaintiffs wherever they occur;

C.  An award of costs and reasonable attorneys' fees incurred in the prosecution of this action; and,

D.  Any other relief the Court deems just and proper.

Respectfully submitted,

/s/ Thomas Olp IL ARDC #3122703
Timothy Belz*
J. Matthew Belz*
**THE THOMAS MORE SOCIETY**
309 West Washington, Suite 1250
Chicago, IL 60606
312-782-1680
tolp@thomasmoresociety.org
tbelz@olblaw.com
jmbelz@olblaw.com

*Pro hac vice applications pending

*Attorneys for Plaintiffs*